**Laverne KULLING, individually and as personal representative of the estate of Carl G. Kulling, Richard A. Beal, and William A. Scheib, Plaintiffs,**

v.

**GRINDERS FOR INDUSTRY, INC., and Toyoda Machinery U.S.A. Corporation, Defendants.**

No. 99–74339.

United States District Court, E.D. Michigan, Southern Division.

Oct. 1, 2000.

---

Jaimie R. Goodman, Detroit, MI, for Plaintiffs.

Steve J. Weiss, Bloomfield Hills, MI, for Defendants.

## OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. *INTRODUCTION*

Plaintiffs Laverne Kulling, Richard A. Beal, and William A. Scheib brought suit in this Court on September 3, 1999, alleging that Plaintiffs Beal and Scheib and Plaintiff Kulling's late husband, Carl G. Kulling, were unlawfully discharged from their employment with Defendant Toyoda Machinery U.S.A. Corporation ("Toyoda") and its wholly-owned subsidiary, Defendant Grinders For Industry, Inc. ("GFI"), in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.* Plaintiff Kulling also has asserted a derivative claim for loss of consortium, as well as a derivative claim as personal representative of the estate of Carl Kulling, seeking additional monetary damages under Michigan's wrongful death statute, Mich.Comp.Laws § 600.2922, for Mr. Kulling's suicide just over two months after Defendants terminated his employment.

By motion filed on May 19, 2000, Defendants now seek an award of summary judgment in their favor on all of Plaintiffs' claims.[1] In support of this motion, Defendants argue (i) that the challenged employment actions were part of a reduction-in-force ("RIF") undertaken for purely economic reasons, and were not motivated by improper considerations of age; and (ii) that Plaintiffs have failed to establish a sufficient causal connection between Carl Kulling's discharge and his subsequent suicide to warrant an award of wrongful death damages. Plaintiffs responded to this motion on June 13, 2000, and Defen-

dants filed a reply brief in further support of their motion on June 28, 2000.[2] Finally, on August 4, 2000, the parties filed supplemental briefs addressing various legal issues surrounding Plaintiff Kulling's request for wrongful death damages.

On July 27, 2000, the Court heard oral argument on Defendants' motion. Having reviewed the briefs and supporting materials submitted by the parties, and having considered the arguments of counsel at the July 27 hearing, the Court is now prepared to rule on this motion. This Opinion and Order sets forth the Court's ruling.

### II. *FACTUAL AND PROCEDURAL BACKGROUND*

#### A. The Parties

Defendant GFI is a wholly-owned subsidiary of Defendant Toyoda, which purchased GFI in 1987. GFI is part of the Grinding Machine Division ("GMD") of Toyoda, and is in the business of re-manufacturing and rebuilding used grinders. Plaintiffs Beal and Scheib and the late husband of Plaintiff Kulling, Carl Kulling, all were employed by GFI prior to its acquisition by Toyoda, and they continued as employees at Defendants' facility in Wixom, Michigan following this acquisition.[3]

Each Plaintiff held a supervisory middle-management position at the time he was discharged on November 7, 1997. Carl Kulling began working for GFI on November 9, 1972 as an Electric Panel Builder, and held the position of Shipping and Receiving Supervisor at the time of his discharge. Plaintiff Beal was first employed by GFI in December of 1972, and had the title of Purchasing Manager in

---

1. The parties also have recently filed a number of other motions, all of which are addressed in this Opinion and Order.

2. This reply brief has itself spawned an additional dispute among the parties. Specifically, on July 7, 2000, Plaintiffs filed a motion to strike portions of Defendants' reply brief, contending that Defendants improperly raised

new issues in their reply that had not been addressed in their initial motion and brief in support. Plaintiffs' motion is addressed below.

3. For convenience, employees Beal, Scheib, and Carl Kulling will be collectively referred to as "Plaintiffs" in the remainder of this Opinion.

November of 1997. Plaintiff Scheib began working for GFI in January of 1985, and was employed as Manager of Mechanical Engineering at the time of his discharge. All three Plaintiffs were over the age of 50 when they were discharged—Carl Kulling was 60, Richard Beal was 53, and William Scheib was 60.

### B. The Circumstances Surrounding Plaintiffs' Discharges

According to Defendants, Plaintiffs were terminated pursuant to a reduction-in-force ("RIF") carried out by Defendants in late 1997 and early 1998. Toyoda's president, Howard Michael, testified at his deposition that Defendants' GMD had sustained losses the previous few years, and that he elected to reduce this division's workforce by twenty employees in order to avoid shutting down the division altogether. Michael instructed Gary Blanchard, the vice president and general manager of GMD, to implement this RIF. Blanchard, in turn, consulted with GFI's senior director of operations, Paul Lefief, and GFI's director of engineering, Eddie McClymont, regarding the selection of the 20 employees to discharge.

Paul Lefief recommended that the supervisory positions held by Carl Kulling and Plaintiff Beal be eliminated. He testified that, in making these decisions, he "looked at the position that they played in the structure, if I had another manager that could do their job, I looked at how many people reported to them." (Defendants' Motion, Ex. 3, Lefief Dep. at 17.) In both cases, Lefief testified that he had identified one or more existing employees who could assume the functions previously performed by Kulling and Beal. Lefief denied that age, years of service, salary, or proximity to retirement played any role in his recommendations. (*Id.* at 17–18.)

For his part, Eddie McClymont suggested to Gary Blanchard that Plaintiff Scheib's position be eliminated. In his affidavit, McClymont states that he determined that the Engineering Department could afford to eliminate a management position, and that Scheib was the "logical choice because he was the only one at management level in the mechanical engineering section." (Defendants' Motion, Ex. 4, McClymont Aff. at ¶ 6.) McClymont further states that he assumed Scheib's management responsibilities, and that two other employees were assigned to handle Scheib's remaining duties in addition to their existing job functions.

The first set of terminations occurred on November 7, 1997, and included all three Plaintiffs. Each Plaintiff executed a "Severance Agreement and General Release," (Defendants' Motion, Ex. 5), and each received severance pay.[4] In all, five salaried employees were discharged on November 7, 1997 as part of Defendants' RIF plan for the GMD, and two more salaried employees were discharged in January of 1998 pursuant to this plan.[5] Each of these seven discharged employees was over 50 years of age, leaving 19 remaining salaried employees over the age of 50. In contrast, the RIF did not affect any of Defendants' 43 salaried employees under the age of 50.

The parties dispute Defendants' stated economic basis for implementing a RIF. As noted earlier, Toyoda's president, Howard Michael, testified that Defendants'

---

4. Plaintiffs contend that these agreements are ineffective to release their ADEA claims, because Defendants failed to comply with the terms of the Older Workers Benefit Protection Act, ("OWBPA"), 29 U.S.C. § 626(f)(1), in procuring these releases. *See generally Oubre v. Entergy Operations, Inc.,* 522 U.S. 422, 118 S.Ct. 838, 139 L.Ed.2d 849 (1998) (discussing the requirements imposed under the OWBPA). In their present motion, Defendants do not contend that Plaintiffs' ADEA claims have been released.

5. Another salaried employee, Gayle Sich, was terminated on November 17, 1997. However, this discharge was not part of the RIF, but was due to an alleged attitude problem. In addition, several hourly employees were discharged, but these determinations apparently were made strictly on the basis of seniority under the terms of a collective bargaining agreement.

GMD had sustained losses for a number of years prior to and including 1997, that orders were down, and that the types of orders coming in were unprofitable. Plaintiffs, however, point to Michael's testimony that his bonuses were tied to the profitability of GFI, and that he received bonuses of $60,000 to $75,000 in January and July of 1998. Plaintiffs also cite financial data received from Defendant, reflecting increases in GMD's total sales and operating margin from 1996 to 1997, as well as a 31.5% increase in Toyoda's overall sales between March of 1994 and March of 1998. (*See* Plaintiffs' Response, Ex. U.) These materials also indicate that GMD suffered from manpower shortages in 1997 in its engineering and manufacturing departments.

The parties also dispute whether Plaintiffs' positions were eliminated, or whether Plaintiffs actually were replaced by others performing essentially the same tasks. Plaintiffs concede that no new employees were hired to assume their former job responsibilities, and that existing employees took on these duties. Yet, while Defendants maintain that several existing employees assumed Plaintiffs' various job functions in addition to their current duties, Plaintiffs contend that Defendants made one-for-one exchanges, in each case replacing one of the Plaintiffs with a substantially younger employee. In support of this assertion, Plaintiffs rely principally on interrogatory responses in which Defendants identified three specific individuals—Gordon Roe, Scott Miller, and Shawn Schultz—as the "[r]eplacement person[s]" for the three Plaintiffs, while others who also were discharged as part of the RIF are not listed as having been replaced by a particular existing employ-

ee. (*See* Plaintiffs' Response, Ex. B, interrogatory responses.)[6] Plaintiffs also point to. evidence that the three "replacement" employees, all of whom were age 40 or younger, all were promoted to supervisory positions within a short time after Plaintiffs were discharged. This seemingly casts doubt on Defendants' claim that Plaintiffs' positions were eliminated as unnecessary, with their duties spread among several remaining employees.

Finally, each Plaintiff has testified as to allegedly age-based comments made by Defendants' management when called upon to explain the challenged employment decisions. Richard Beal testified that, upon learning of his discharge, he was told by Paul Lefief that he was "the first of a number of retirement age employees being let go." (Plaintiffs' Response, Ex. C, Beal Dep. at 64.) William Scheib testified that Eddie McClymont advised him of his termination, and further stated that there was a "corporate plan by Howard Michael and Gary Blanchard to bring ... the younger employees up the ladder." (Plaintiffs' Response, Ex. D., Scheib Dep. at 59.) Similarly, Laverne Kulling testified that she met with Gary Blanchard on the day her husband was discharged, and that Blanchard told her that "the company was downsizing, and they were letting go of the older, more senior people." (Plaintiffs' Response, Ex. A, Kulling Dep. at 108.)[7] Defendants, however, have produced deposition testimony and affidavits denying that these statements were made.

## C. Carl Kulling's Suicide Following His Discharge

As noted earlier, Plaintiff Laverne Kulling seeks an additional award of damages

---

**6.** The Court further notes that the individuals named in these discovery responses are not the same employees identified in the testimony of Paul Lefief and Edward McClymont as having assumed Plaintiffs' duties upon their discharges.

**7.** Plaintiffs also point to Gary Blanchard's deposition testimony that he met with Defendants' attorneys in connection with the

planned RIF to "explain[ ] some of the things we were going to do, and one of the issues I had was with age." (Plaintiffs' Response, Ex. J, Blanchard Dep. at 46.) In addition, Plaintiffs cite the deposition of another of Defendants' employees, Shawn Schultz, who testified that she and her co-workers joked that Defendants had targeted the "Over 50 Club" for termination. (Plaintiffs' Response, Ex. F, Schultz Dep. at 47.)

under Michigan's wrongful death statute, Mich.Comp.Laws § 600.2922, based on Carl Kulling's death just over two months after his discharge on November 7, 1997. According to Laverne Kulling, following her husband's discharge, he began sinking "into a depression, deeper and deeper by the day, and the little bit that I could get from him, which wasn't much, was just that he was terribly depressed, and he kept talking about his age." (Plaintiffs' Response, Ex. A, Kulling Dep. at 142.) Despite this condition, Mr. Kulling secured a new job as a shipping and receiving clerk on November 17, 1997, less than two weeks after Defendants discharged him. Mr. Kulling worked full time at this job until his death by suicide on January 18, 1998.

Mrs. Kulling testified that she first noticed symptoms of her husband's depression at her son's wedding on December 13, 1997, approximately one month after Mr. Kulling was discharged. On January 2, 1998, Mr. Kulling sought treatment for his depression from his family physician, Dr. Edward Pearce. Dr. Pearce prescribed Zoloft, an anti-depressant, and referred Mr. Kulling for psychiatric evaluation.

On January 17, 1998, Mr. Kulling visited Dr. Sander J. Breiner, a psychiatrist. During this session, Mr. Kulling reportedly complained of depression and inability to function following his job loss.[8] Mr. Kulling reported his symptoms as weight loss, as well as pacing and restlessness beginning approximately three weeks earlier. He stated his concern that he might be unable to work, and that he might lose his home and wife. Although Mr. Kulling was unable to identify the basis for his depression and anxiety, he spoke of an "administrative routine" he had developed in connection with his prior job, and noted that his new job, while similar, involved a different routine. (Defendants' Motion, Ex. 16.) Dr. Breiner's notes also indicate that Mr. Kulling reported some difficulties in his marriage. During this visit, Dr.

Breiner also spoke with Mr. Kulling's wife and daughter. Following this session, Dr. Breiner made an initial diagnosis of depression and anxiety, and proposed that Mr. Kulling begin a course of treatment involving at least three visits per week.

Upon returning home from his session with Dr. Breiner on January 17, 1998, Mr. Kulling remained distant and generally non-responsive. However, according to Mrs. Kulling, her husband stated that he was going to quit his new job the following Monday, that he "knew he'd been discriminated against at Grinders," and that "he knew he wasn't coping with" his recent discharge. (Defendants' Motion, Ex. 6, Kulling Dep. at 176.) The following morning, Mrs. Kulling was in the bathroom when she heard a shot. She called the police, who discovered that Mr. Kulling had shot himself with a rifle in the basement of his home.

Plaintiffs have produced an affidavit from Dr. Breiner, who opines, based on his single session with Mr. Kulling on January 17, 1998, that Mr. Kulling's suicide was attributable to the loss of his job with Defendant, and not other factors such as marital difficulties. Specifically, Dr. Breiner states:

> It is my opinion based on my examination of Mr. Kulling that he had a significant psychological illness, as expressed by the serious depression, impaired judgment and final act of suicide. The loss of his job at Grinders For Industry—Toyoda Machinery was the cause of the serious depression and psychotic break with reality which directly led to his suicide. It is my conclusion that the loss of his job was the cause of Mr. Kulling's death by suicide and the emotional injuries resulting in his death.

> While Mr. Kulling did not show any symptoms of psychosis when I examined him, his death by suicide was caused by this serious depression which resulted in a psychotic break with reality. The serious depression and psychotic break

8. This information is derived from Dr. Breiner's medical records, as transcribed by Defendants' counsel following a discussion with Dr. Breiner. (*See* Defendants' Motion, Ex. 16.)

with reality caused by Mr. Kulling's termination from employment by Grinders For Industry—Toyoda Machinery led to an uncontrollable impose of irrational rage (turned against himself) by Mr. Kulling causing him to commit death by suicide.

(Plaintiffs' Response, Ex. H, Breiner Aff. at ¶¶ 9–10.) Similarly, Plaintiffs cite the deposition testimony of their psychiatric expert, Dr. Gerald A. Shiener, that Mr. Kulling suffered from a mental illness caused by his discharge by Defendants, that this mental illness resulted in his death, and that this illness led to an irresistible impulse to end his life. (*See* Plaintiffs' Response, Ex. I, Shiener Dep. at 148–49.)

Defendants advance three grounds for challenging this conclusion. First, they note that Mr. Kulling was able to secure new employment almost immediately after his discharge by Defendants. Next, they point to the passage of time, perhaps a month or more, between Mr. Kulling's termination and the first report of symptoms of depression. In fact, Mr. Kulling did not seek treatment until early January of 1998, almost two months after his discharge.

Finally, Defendants have produced medical records indicating that Mr. Kulling suffered from an episode of depression in 1988, following Defendants' assignment of him to a new position in the sales department. The notes of his treating psychiatrist at the time, Dr. Luis Pomodoro, suggest that Mr. Kulling was experiencing difficulties adjusting to changes in work assignments. (*See* Defendants' Motion, Exs. 7, 9, 10.) Based on this earlier episode, Defendants contend that Mr. Kulling's problems in late 1997 and early 1998 were manifestations of his longstanding depression, and that his more recent difficulties, like his earlier ones, were attributable to his inability to adapt to new situations and changes in job conditions. In support of this contention, Defendants have produced an expert psychiatric report from Dr. Elissa P. Benedek, opining that

Mr. Kulling "suffered from a pre-existing mental condition/illness beginning in 1988," and that this longstanding condition was exacerbated by his "difficulty in accommodating to his new employment." (Defendants' Motion, Ex. 31, Benedek Report at 2.)

## D. Procedural Background

Plaintiffs commenced this action in this Court on September 3, 1999. Plaintiffs' first amended complaint, filed on September 13, 1999, includes two counts: (1) a claim under the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.,* alleging that Defendants unlawfully discharged Plaintiffs on account of their age; and (2) a loss of consortium claim, brought by Plaintiff Laverne Kulling only. As noted earlier, Plaintiff Kulling also seeks additional damages under Count I for the wrongful death of her husband, Carl Kulling.

By motion filed on May 19, 2000, Defendants now seek summary judgment in their favor on each of Plaintiffs' two claims. First, Defendants argue that Plaintiffs cannot establish a *prima facie* case of age discrimination, where the challenged employment decisions were solely the product of a legitimate and economically motivated reduction in force. Next, even if Plaintiffs' ADEA claims are permitted to go forward, Defendants assert that Plaintiff Laverne Kulling is not entitled to wrongful death damages, because she has failed to produce evidence that her late husband's termination caused a mental illness leading to the irresistible impulse to commit suicide. Finally, Defendants argue that Plaintiff Kulling's separate loss-of-consortium claim must fail, because it is subsumed either within her underlying ADEA claim or her derivative claim for wrongful death damages.

Plaintiffs responded to these arguments in a brief filed on June 13, 2000, and Defendants in turn filed a reply brief on June 28, 2000 in further support of their motion.[9] On July 27, 2000, counsel for the

---

9. By motion filed on July 7, 2000, Plaintiffs

complain that Defendants raised new issues

parties appeared before the Court to present further arguments in support of their respective positions. Following this hearing, both parties submitted supplemental briefs addressing Plaintiff Kulling's claim for damages under Michigan's wrongful death statute.

## III. ANALYSIS

### A. The Standards Governing Defendants' Motion

In their present motion, Defendants seeks summary judgment in their favor pursuant to Fed.R.Civ P. 56. Under this Rule, summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era"·in the federal courts' review of motions for summary judgment. These cases, in the aggregate, lowered the movant's burden in seeking summary judgment. As stated in *Celotex*:

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element

essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy of cases, the Sixth Circuit adopted a series of principles governing motions for summary judgment. These principles include:

* The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

in their reply brief, and they ask the Court to strike the offending portions of this reply. Specifically, Plaintiffs point to portions of Defendants' reply brief arguing (i) that Plaintiffs have not shown that Defendants' stated reasons for their employment decisions were pretextual, and (ii) that Plaintiff Laverne Kulling's wrongful death claim has been released by virtue of the severance agreement Carl Kulling signed upon his discharge. The Court agrees that these arguments were not

made in Defendants' initial motion and brief. Nevertheless, as discussed below, the Court finds that Plaintiffs' motion is largely moot, because the issues raised in Defendants' reply brief do not affect the outcome of Defendants' motion. Moreover, following the July 27, 2000 hearing on Defendants' motion, Plaintiffs were given an opportunity to address the latter of these two arguments in a supplemental brief.

*Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479–80 (6th Cir.1989); *see also Nernberg v. Pearce*, 35 F.3d 247, 249 (6th Cir.1994). The Court will apply these standards in resolving Defendants' motion for summary judgment.

## B. Plaintiffs' Age Discrimination Claims Under the ADEA

Defendants' principal argument in support of their motion is that Plaintiffs were discharged pursuant to a legitimate, economically driven reduction-in-force ("RIF") within Defendants' Grinding Machine Division ("GMD"). If so, it follows that Plaintiffs cannot show that their terminations were motivated by impermissible considerations of age. In response, Plaintiffs question whether Defendants carried out a true RIF in their Wixom, Michigan facility, and they further contend that the evidentiary record discloses the age-based reasons for the challenged employment decisions. Although the question is a close one, the Court is inclined to view Defendants' actions as consistent with a true RIF. Nevertheless, regardless of whether Plaintiffs must meet the burden imposed in RIF cases, or whether they must instead establish a more traditional *prima facie* case of age discrimination, the Court is satisfied that they have met their burden, at least to the extent necessary to survive a motion for summary judgment.

### 1. Defendants' Reduction–In–Force Defense

■ In their motion, Defendants assert that their decisions to discharge Plaintiffs were not motivated by considerations of age, but by a legitimate business decision to reduce their GMD workforce as a result of economic losses within that division. As noted earlier, Plaintiffs have produced evidence that, in their view, casts doubt upon the "economic losses" cited by Defendants as motivating the RIF at issue. Leaving this aside for the moment, however, Plaintiffs' principal contention is that Defendants did not undertake a RIF at all, but simply replaced Plaintiffs with other, younger employees. The Court finds that this

contention cannot be squared with the controlling Sixth Circuit precedents on this issue.

The parties agree that the Sixth Circuit's decision in *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1464–65 (6th Cir.), *cert. denied*, 498 U.S. 878, 111 S.Ct. 211, 112 L.Ed.2d 171 (1990), provides the starting point in this Court's inquiry. In *Barnes*, the Court began its analysis of the plaintiffs' age discrimination claims by looking to the tripartite standard set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The Sixth Circuit observed, however, that the elements of a traditional *prima facie* case under *McDonnell Douglas* do not suffice in a case involving a workforce reduction, because this *prima facie* showing, without more, would not support an inference of unlawful discrimination:

> We do not believe the same rationale [*i.e.*, that an inference of discrimination arises from the *prima facie* case] applies to a work force reduction where the plaintiff has done no more than show the elements of the *McDonnell Douglas* formula that relate to his or her situation: (1) that he or she was age forty or over; (2) that he or she was qualified to perform the job; and (3) that he or she was discharged. When work force reductions by the employer are a factor in the decision, "the most common legitimate reasons" for the discharge are the work force reductions. By showing the other elements of a *McDonnell Douglas* case, a plaintiff has not presented any evidence indicating that the work force reductions are not the reasons for the discharge and therefore does not make out a prima facie case absent additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out the plaintiff for discharge for impermissible reasons.
>
> Our conclusion would not change even if a plaintiff additionally demonstrated that younger persons were retained in

other jobs which the plaintiff was qualified to perform. A different result would allow every person age 40–and–over to establish a prima facie case of age discrimination if he or she was discharged as part of a work force reduction.

*Barnes,* 896 F.2d at 1464–65 (citations and footnote omitted).

The Court then provided some guidance in determining whether a case involves a true RIF, and thus requires a modified *prima facie* showing:

> It is important to clarify what constitutes a true work force reduction case. A work force reduction situation occurs when business considerations cause an employer to eliminate one or more positions within the company. An employee is not eliminated as part of a work force reduction when he or she is replaced after his or her discharge. However, a person is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties.

896 F.2d at 1465. The Sixth Circuit extended this ruling in a subsequent case, holding that a RIF occurs even where the position formerly occupied by the plaintiff is not eliminated, so long as the employer's "overall shuffling" results in "the elimination of one employment position and accomplishe[s] cost savings" for the employer. *Brocklehurst v. PPG Indus., Inc.,* 123 F.3d 890, 895 (6th Cir.1997).

Returning to the present case, it appears at first glance that Defendants' discharges of Plaintiffs had all of the characteristics of a true RIF. Plaintiffs concede that no new employees were hired to fill their former positions. Rather, the evidence unquestionably shows that the tasks previously performed by Plaintiffs were assumed by existing employees—although, to be sure, the record is a great deal less clear as to which duties were assumed by which employees. Consequently, if it is enough, under *Brocklehurst,* that Defendants' actions had the "net effect" of reducing the number of positions within the GMD workforce, then the terminations of Plaintiffs surely accomplished this result.

Yet, as Plaintiffs point out, *Barnes* holds that an employee is replaced, and no true RIF occurs, when "another employee is hired or *reassigned*" to perform his duties. *Barnes,* 896 F.2d at 1465 (emphasis added); *see also Tinker v. Sears, Roebuck & Co.,* 127 F.3d 519, 522 (6th Cir. 1997) (finding that the defendant employer "effectively replaced" the plaintiff by "reassigning another employee to assume [his] duties," and observing that "[t]his type of reassignment is analogous to hiring a new employee to cover the terminated employee's duties"). The *Barnes* Court further cautioned that "an employer could not avoid liability by changing the job title or by making minor changes to a job indicative of an attempt to avoid liability." *Barnes,* 896 F.2d at 1465 n. 10. On the other hand, *Brocklehurst* holds that a true RIF may occur even where another existing employee is reassigned to the plaintiff's former position, so long as this reassignment leaves an unoccupied position that remains unfilled. According to the *Brocklehurst* Court, this rule is necessary to permit an employer to fill an "essential" position without forfeiting its appeal to workforce reduction as the reason for a challenged employment decision. *Brocklehurst,* 123 F.3d at 895.

This case lies somewhere between the rules stated in *Barnes* and *Brocklehurst.* Defendants assert that the situation here lies squarely within the holding in *Barnes* because, according to the deposition testimony of Defendants' management, Plaintiffs' former job responsibilities were "redistributed among other existing employees already performing related work." *Barnes,* 896 F.2d at 1465. As Plaintiffs point out, however, the evidence on this question is far

from undisputed. In particular, the deposition testimony cited by Defendants, which indicates that Plaintiffs' duties were divided among several supervisory and non-supervisory employees, is contradicted by Defendants' own interrogatory responses, which identify specific individuals who "replaced" each Plaintiff. Moreover, Plaintiffs have produced evidence that each of these "replacement" employees was promoted to a supervisory position within a short time before or after Plaintiffs were discharged from similar supervisory positions. Thus, the record does not rule out Plaintiffs' contention that they were "replaced" as that term is defined in *Barnes* —that is, other employees were "reassigned to perform" their duties. *Barnes,* 896 F.2d at 1465.

Under *Brocklehurst,* however, such reassignments are consistent with a true workforce reduction, so long as Defendants actually eliminated positions and reduced costs. Plaintiffs have failed to produce any evidence to challenge Defendants' assertion that a number of positions were eliminated in the alleged RIF that produced Plaintiffs' discharges. Arguably, though, *Brocklehurst* can be read as carving out only a limited exception to *Barnes'* rule of "reassignment," under which an employer may reassign an employee to a vacated but "essential" position without forfeiting its appeal to an economically motivated RIF. *See Brocklehurst,* 123 F.3d at 895 (emphasizing the employer's argument that the plaintiff's position in that case was not eliminated because it was deemed "essential"). Viewed in this way, *Brocklehurst* is unavailing to Defendants here, because they claim to have selected Plaintiffs for discharge, not based on any deficiencies in their job performance, but only after concluding that their supervisory positions were expendable. Defendants cannot have it both ways, claiming that the positions held by Plaintiffs were deemed most susceptible to elimination, and yet reassigning other employees to these same or similar positions shortly after Plaintiffs were terminated.

In short, while there are some indications of a genuine workforce reduction in this case, other evidence points in the opposite direction. In any event, the Court finds it unnecessary to resolve this issue because, under either a RIF-based or traditional *McDonnell Douglas* analysis, Plaintiffs have identified issues of fact that preclude an award of summary judgment to Defendants. Assuming, for present purposes, that this case involves a true RIF, *Barnes* requires that Plaintiffs' *prima facie* case must include, in addition to the standard elements (none of which are contested here), "additional direct, circumstantial, or statistical evidence tending to indicate that the employer singled out [Plaintiffs] for discharge for impermissible reasons." *Barnes,* 896 F.2d at 1465; *see also Brocklehurst,* 123 F.3d at 895–96 (holding that, once an employer has identified an economically motivated RIF, the plaintiff must present "evidence that, when viewed in his favor, would permit a reasonable jury to conclude that age was a determining factor in [the employer's] decision to discharge him"). The Court concludes that Plaintiffs have met this burden, through both direct and statistical evidence.

First, as discussed earlier, each Plaintiff has pointed to remarks allegedly made by Defendants' management in connection with his discharge that suggest an unlawful age-based reason for this action. When they inquired about their terminations, Plaintiffs allegedly were told that they were "the first of a number of retirement age employees being let go," that there was a "corporate plan ... to bring ... the younger employees up the ladder," and that "the company was downsizing, and they were letting go of the older, more senior people." Although Defendants deny that these statements were made, the Court is obliged to assume otherwise for purposes of the present motion.

Neither can the Court accept Defendants' characterization of these alleged remarks as "isolated" or "ambiguous," where they purportedly were made by key decisionmakers as they informed Plaintiffs of their discharges, and where each remark expressly refers to age. As Plaintiffs correctly observe, the cases cited by Defendants are distinguishable, as none involved such direct, contemporaneous statements by persons involved in the challenged employment decision. *See, e.g., Carpenter v. Western Credit Union,* 62 F.3d 143, 144–45 (6th Cir.1995) (discounting a statement allegedly made by a decisionmaker to an outside individual at some unspecified time after the plaintiffs' terminations, defending the challenged decisions);[10] *Gagne v. Northwestern Nat'l Ins. Co.,* 881 F.2d 309, 314 (6th Cir.1989) (declining to view a supervisor's statement as sufficient to establish improper age-based decisionmaking, where the plaintiff herself "characterized the comment at issue as an isolated remark uttered by her supervisor during a meeting attended by a number of employees, and indicated that the statement was made facetiously and was not directed at any particular individual"). In contrast, Plaintiffs have identified cases in which the Sixth Circuit recognized the probative value of statements made by management contemporaneously with a challenged employment action. *See, e.g., Scott v. Goodyear Tire & Rubber Co.,* 160 F.3d 1121, 1129 (6th Cir.1998) (finding statements by management officials "relevant and probative," where they were "made in and around the time of the corporate reorganization" and were "consistent with what took place"); *Wells v. New Cherokee Corp.,* 58 F.3d 233, 238 (6th Cir.1995) ("[C]ourts must consider as probative evidence any statements made by those individuals who are in fact meaningfully involved in the decision to terminate an employee"). Plainly, the statements alleged by Plaintiffs satisfy this standard, and hence must be considered in determining whether Plaintiffs have met their burden under *Barnes.*

Next, Plaintiffs have produced statistical evidence of an age disparity in the workers selected by Defendants for discharge. Out of the seven salaried employees who were discharged, all were over the age of 50. Before the alleged RIF, 69 salaried GMD employees worked at the Wixom facility; 26 of these were age 50 or older, while 43 were less than 50 years old. All seven employees selected in Defendants' alleged RIF were in the former, over–50 category, including all three Plaintiffs. According to Plaintiffs' statistical expert, Nitin V. Paranjpe, Ph.D., there is only a 0.1% chance that such a disparity would occur if age were not considered in Defendants' termination decisions. (*See* Plaintiffs' Response, Ex. E, Paranjpe Report at 4.) Plaintiffs' expert also points to the significant difference in the average age of those employees who were discharged (56.1) and the average age of those who were retained (44.9). Defendants complain that the small sample size of Plaintiffs' data renders the conclusions of their statistical expert inherently suspect. *See Brocklehurst,* 123 F.3d at 897. The Sixth Circuit, however, has recognized that even where a statistical analysis is "not as probative as [it] perhaps may have been," it nevertheless may serve to "increase the likelihood that the decisions to eliminate certain positions were based on age." *Scott,* 160 F.3d at 1129. The Court finds that Plaintiffs' statistics achieve this limited purpose here.

Finally, Plaintiffs have produced circumstantial evidence that casts at least some doubt on Defendants' claim that the challenged employment decisions were not motivated by considerations of age, but instead by economics and business judgment as to which positions were the most ex-

---

**10.** Although the *Carpenter* Court rejected the statement in question as too "isolated and ambiguous" to support a finding of age discrimination, it is worth noting that the Court nevertheless relied on this same statement as "direct evidence of age discrimination" sufficient to overcome the plaintiff's burden to establish a *prima facie* case. *Carpenter,* 62 F.3d at 145.

pendable. First, as noted earlier, Plaintiffs point to evidence, including executive bonuses and financial reports, that tends to refute Defendants' contention that a workforce reduction was necessitated by several years of losses within GFI and GMD. Plaintiffs also have identified inconsistencies in the record as to who assumed the work duties previously performed by Plaintiffs. For example, while Defendants assert in their motion that Charles Queener assumed some of Carl Kulling's and Richard Beal's job responsibilities, Plaintiffs have submitted an affidavit from Mr. Queener specifically denying that he assumed these duties. (*See* Plaintiffs' Response, Ex. N, Queener Aff. at ¶¶ 4, 7.) Plaintiffs further cite the deposition testimony of Gary Blanchard, GMD's vice president, that he specifically addressed the issue of age with Defendants' attorneys in connection with the planned RIF.

The Court need not decide whether any of the above forms of evidence, standing alone, would be sufficient to meet Plaintiffs' burden under *Barnes*. The Court readily concludes that the record, viewed as a whole, would permit the inference that Defendants selected Plaintiffs for discharge based on their age. Viewing this as a RIF case, the Court finds that Plaintiffs' evidence suffices to establish a *prima facie* case of age discrimination, and to defeat Defendants' motion for summary judgment.

### 2. Plaintiffs' Claims as Viewed Under the *McDonnell Douglas* Standard

■ Alternatively, accepting Plaintiffs' position that this case does not involve a true RIF, this Court's inquiry then is governed by the traditional *McDonnell Douglas* framework. Under this standard, the Court concludes, for many of the same reasons set forth above, that Plaintiffs' age discrimination claims survive summary judgment.

Assuming, for present purposes, that Plaintiffs were replaced and not terminated as part of a true RIF, Plaintiffs first must establish a *prima facie* case of age

discrimination by showing (1) that they were members of the protected over–40 class, (2) that they were subjected to adverse employment actions, (3) that they were qualified for their positions, and (4) that they were replaced by younger persons. *See Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 371 (6th Cir.1999); *Tinker, supra*, 127 F.3d at 522. There is no question that Plaintiffs all were over 40 years old, and that they were discharged. In addition, Defendants do not challenge Plaintiffs' qualifications for their positions; to the contrary, they expressly deny that Plaintiffs' job performances played any role in their determination of which positions to eliminate. Finally, Defendants' own discovery responses acknowledge that each Plaintiff was "replaced" by a younger person. In fact, while each Plaintiff was over 50 at the time of his discharge, none of the individuals identified by Defendants as Plaintiffs' "replacements" was over the age of 40.

Plaintiffs having established a *prima facie* case, Defendants then bear the burden of articulating legitimate, nondiscriminatory reasons for the challenged employment decisions. *Brocklehurst*, 123 F.3d at 897. Again, there is no question that Defendants have met this burden of production. Specifically, Defendants state that Plaintiffs were discharged as part of an economically motivated RIF implemented in response to GFI's ongoing financial difficulties and lack of profitability. Defendants further assert that they selected employees for discharge based on the ease with which their job duties could be reassigned to other, existing employees.

This leaves Plaintiffs with the burden of showing that the reasons advanced by Defendants were not the true bases for their decisions, but that Defendants instead were motivated by unlawful considerations of age. *See Tinker*, 127 F.3d at 523; *Brocklehurst*, 123 F.3d at 897. The outcome of this inquiry is largely determined by the same analysis employed by the Court when examining this case under the

RIF standard set forth in *Barnes, supra.*[11] First, the Court already has noted the issues of fact as to Defendants' stated economic basis for eliminating positions. In addition, the contradictory evidence as to whether Defendants truly eliminated Plaintiffs' positions or instead reassigned existing (and significantly younger) employees to those positions casts doubt upon Defendants' proffered, age-neutral basis for determining which employees to discharge.

More generally, the Court already has surveyed Plaintiffs' direct, circumstantial, and statistical evidence, and has determined that a reasonable factfinder could conclude, based on the totality of this evidence, that Defendants discriminated on the basis of age in selecting Plaintiffs for discharge. In light of this evidence, the Court finds that Plaintiffs' age discrimination claims survive Defendants' motion for summary judgment.

## C. Plaintiff Kulling's Claim for Wrongful Death Damages Under the ADEA

■ As part of the age discrimination claim brought on behalf of her late husband Carl, Plaintiff Laverne Kulling seeks additional relief under Michigan's wrongful death statute, Mich.Comp.Laws § 600.2922. This statute provides, in relevant part:

> Whenever the death of a person or injuries resulting in death shall be caused by wrongful act, neglect, or fault of another, and the act, neglect, or fault is such as would, if death had not ensued, have entitled the party injured to maintain an action and recover damages, the person who or the corporation which would have been liable, if death had not ensued, shall be liable to an action for damages, notwithstanding the death of the person injured.

Mich.Comp.Laws § 600.2922(1). This statute further delineates the types of damages that may be awarded in a wrongful death action:

> In every action under this section the court or jury may award damages as the court or jury shall consider fair and equitable, under all the circumstances including reasonable medical, hospital, funeral, and burial expenses for which the estate is liable; reasonable compensation for the pain and suffering, while conscious, undergone by the deceased person during the period intervening between the time of the injury and death; and damages for the loss of financial support and the loss of the society and companionship of the deceased.

Mich.Comp.Laws § 600.2922(6).

In their present motion for summary judgment, Defendants contend that Plaintiff Laverne Kulling cannot establish the requisite causal link between her husband's allegedly wrongful discharge[12] and his subsequent death by suicide that would entitle her to collect wrongful death damages. In support of this argument, Defendants rely principally on *Jamison v. Storer Broadcasting Co.*, 511 F.Supp. 1286, 1291–92 (E.D.Mich.1981), *aff'd in part, rev'd in part*, 830 F.2d 194 (6th Cir.1987). In *Jamison*, a discriminatory discharge case, Judge Boyle of this Court held that a suicide cannot be viewed as a consequence of a wrongful discharge unless the defendant's wrongful conduct caused a "mental illness which led to an irresistible impulse" to commit suicide. 511 F.Supp. at 1291 (quoting *Tate v. Canonica*, 180 Cal.App.2d 898, 5 Cal.Rptr. 28 (Cal.Ct.App.1960)). Defendants assert that such a showing

---

**11.** Because of this, the Court deems it unnecessary to decide whether, as Plaintiffs claim, Defendants improperly raised the issue of pretext for the first time in their reply brief in support of their motion for summary judgment.

**12.** Plainly, under the express terms of the Michigan statute, if Defendants did not act wrongfully in terminating Mr. Kulling, there would be no basis for awarding wrongful death damages. As discussed earlier, however, Plaintiffs have raised triable issues of fact as to whether Defendants unlawfully discriminated on the basis of age in discharging Mr. Kulling.

cannot be made here, where Mr. Kulling had suffered an earlier bout of depression in the late 1980s, where more than two months elapsed between Mr. Kulling's discharge and his suicide, and where various other factors, such as purported marital troubles and difficulty in adapting to a new job, arguably contributed to Mr. Kulling's final bout of depression and his death by suicide.

Before the Court may reach this substantive question, however, it first must determine the source of the law, state or federal, that governs Plaintiff Kulling's claim for damages.[13] *Jamison* is not helpful on this question, as that case involved claims under Michigan and not federal law. *Jamison*, 511 F.Supp. at 1289. Indeed, this important distinction between *Jamison* and the present case highlights a fundamental issue that the parties completely overlooked in their initial round of briefs: namely, whether Michigan's wrongful death statute has anything to say about the relief that may be sought under the federal ADEA. This is an issue largely of first impression, and its resolution requires the Court to grapple with difficult questions concerning the interplay between state and federal law. Upon traversing this winding path, the Court concludes that the ADEA does not permit the recovery of damages of the sort provided under Michigan's wrongful death act.

■ The Court begins its journey upon well-traveled ground. Plainly, if Carl Kulling had not passed away, the relief he could have recovered for a violation of the ADEA would have been determined by resort to the language of the federal statute itself, along with the decisional law construing its provisions. As the Supreme Court has explained, "it is an elemental canon of statutory construction that where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it." *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 19, 100 S.Ct. 242, 247, 62 L.Ed.2d 146 (1979). Further, "[t]he federal judiciary will not engraft a remedy on a statute, no matter how salutary, that Congress did not intend to provide." *California v. Sierra Club*, 451 U.S. 287, 297, 101 S.Ct. 1775, 1781, 68 L.Ed.2d 101 (1981).

Turning, then, to the remedial provisions of the ADEA, the Sixth Circuit has aptly noted the "strangely convoluted piece of drafting" by which this statute defines the nature of the available relief. *See Wheeler v. McKinley Enterprises*, 937 F.2d 1158, 1163 (6th Cir.1991); *see also Moskowitz v. Trustees of Purdue Univ.*, 5 F.3d 279, 283–84 (7th Cir.1993) (examining in detail the remedial provisions of the ADEA). In particular, the ADEA generally authorizes the courts to "grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter," but it further provides that its remedies are to be determined by reference to certain portions of the Fair Labor Standards Act ("FLSA"). 29 U.S.C. § 626(b).[14] As explained in *Wheeler*:

---

**13.** This threshold issue also is implicated in Defendants' argument, made for the first time in their reply brief, that the severance agreement and release signed by Mr. Kulling following his termination, while perhaps ineffective to release his ADEA claim, serves to bar any possible state-law claim Mrs. Kulling might seek to pursue under Michigan's wrongful death statute. Because the Court must resolve this issue as to the governing law in any event, and because, following the July 27 hearing, the parties were given an opportunity to address this issue in supplemental briefs, the Court need not decide whether Defendants improperly raised their "release" argument for the first time in their reply brief.

**14.** Because the FLSA is directed at violations of federal minimum wage and maximum hour standards, its remedies are defined in terms of "unpaid minimum wages" and "unpaid overtime compensation." 29 U.S.C. § 216(b). These terms, however, have no evident meaning when applied to redress violations of federal age discrimination law. The ADEA bridges this gap in purpose and terminology by providing that "[a]mounts owing to a person as a result of a violation of [the ADEA] shall be deemed to be unpaid minimum wages or unpaid overtime compensation for purposes of [the remedial provisions of the FLSA]." 29 U.S.C. § 626(b). Through this provision, the ADEA "translates" the remedi-

The provisions of the ADEA, it is specified in 29 U.S.C. § 626(b), are to be "enforced in accordance with the powers, remedies, and procedures provided" in designated sections of the Fair Labor Standards Act ("FLSA")—and "[a]mounts owing to a person as a result of a violation of [the ADEA] shall be deemed to be unpaid minimum wages or unpaid overtime compensation for purposes of [FLSA provisions codified at 29 U.S.C. §§ 216 and 217]." The FLSA provides that any employer who violates the minimum wage or overtime provisions of that statute shall be liable not only in the amount of the unpaid minimum wages or unpaid overtime compensation, but also "in an additional equal amount as liquidated damages." 29 U.S.C. § 216(b). And under the ADEA, as distinguished from the FLSA, such liquidated damages are "only" payable "in cases of *willful* violations ..." 29 U.S.C. § 626(b). (Emphasis supplied.)

*Wheeler*, 937 F.2d at 1162–63.[15]

Upon parsing this remedial language of the ADEA in light of its cross-references to portions of the FLSA, the Sixth Circuit concluded that the ADEA establishes a two-tiered scheme of relief:

> ... [A] person who has suffered a wage loss as a result of having been discharged in violation of the ADEA is entitled to judgment for his back pay (the first tier of damages), and is entitled to judgment for liquidated damages in an equal amount (the second tier of damages) if—but only if—the ADEA violation was "willful."

al portions of the FLSA to make sense in the context of ADEA violations.

15. Given these express ADEA provisions delineating the nature of the available relief (albeit in a circuitous fashion), the case cited by Plaintiffs at oral argument and in their supplemental brief, *Franklin v. Gwinnett County Public Schools*, 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992), is readily distinguishable. In *Franklin*, the Court considered whether monetary damages should be recoverable in an implied cause of action under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688. As the

*Wheeler*, 937 F.2d at 1163 (footnote omitted). The Sixth Circuit also has approved the award of front pay as a permissible form of "equitable relief" under the statute. *See Roush v. KFC Nat'l Mgmt. Co.*, 10 F.3d 392, 398 (6th Cir.1993), *cert. denied*, 513 U.S. 808, 115 S.Ct. 56, 130 L.Ed.2d 15 (1994); *Wheeler*, 937 F.2d at 1163 n. 2.

■ However, the ADEA's remedial scheme forecloses many of the forms of damages sought by Plaintiff Kulling in this case under the Michigan wrongful death act. For example, the ADEA does not authorize awards of compensatory damages for pain and suffering or emotional distress. *See Commissioner of Internal Revenue v. Schleier*, 515 U.S. 323, 326, 115 S.Ct. 2159, 2162, 132 L.Ed.2d 294 (1995); *Hill v. Spiegel, Inc.*, 708 F.2d 233, 235–36 (6th Cir.1983); *Pfeiffer v. Essex Wire Corp.*, 682 F.2d 684 (7th Cir.), *cert. denied*, 459 U.S. 1039, 103 S.Ct. 453, 74 L.Ed.2d 606 (1982). Nor may loss of consortium damages be awarded for ADEA violations. *See Moss v. Stinnes Corp.*, 169 F.3d 784, 785 (2d Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 189, 145 L.Ed.2d 159 (1999); *Gerzog v. London Fog Corp.*, 907 F.Supp. 590, 605 (E.D.N.Y.1995); *Reed v. Johnson Controls, Inc.*, 704 F.Supp. 170, 171–72 (E.D.Wis.1989). More generally, the Supreme Court has explained that traditional tort-based compensatory damages are not recoverable under the ADEA:

> Like the pre–1991 version of Title VII, the ADEA provides no compensation "for any of the traditional harms

Court recognized, because Title IX includes no express right of action, "it is hardly surprising that Congress also said nothing about the applicable remedies for an implied right of action," leaving it to the courts to fashion the appropriate relief. 503 U.S. at 71, 112 S.Ct. at 1035; *see also Sea–Land Servs., Inc. v. Gaudet*, 414 U.S. 573, 94 S.Ct. 806, 39 L.Ed.2d 9 (1974) (also cited in Plaintiffs' supplemental brief, and also determining the scope of the available relief in a judge-made federal cause of action for wrongful maritime death). Here, there is no similar statutory void for this Court to fill.

associated with personal injury." Monetary remedies under the ADEA are limited to back wages, which are clearly of an "economic character," and liquidated damages, which we have already noted serve no compensatory function.

*Schleier,* 515 U.S. at 336, 115 S.Ct. at 2167.[16]

Plainly, then, if Carl Kulling were still alive, he could not recover many of the sorts of damages sought by Laverne Kulling under Michigan's wrongful death act. The question becomes whether Mr. Kulling's death altered the scope of the relief awardable for Defendants' alleged violation of the ADEA. In resolving this issue, the Court begins by noting an important distinction between the ADEA and the seminal federal civil rights statute, 42 U.S.C. § 1983. Under this latter enactment, the courts are expressly authorized to look to state law for certain purposes:

> The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of [§ 1983, among other statutes] for the protection of all persons in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of

the United States, shall be extended to and govern the said courts in the trial and disposition of the cause. . . .

42 U.S.C. § 1988(a).

In *Robertson v. Wegmann,* 436 U.S. 584, 585, 98 S.Ct. 1991, 1992, 56 L.Ed.2d 554 (1978), a § 1983 action in which the plaintiff died before trial, the Supreme Court considered whether § 1988 compelled the adoption into federal law of a Louisiana survivorship statute that would have caused the action to abate, or whether the district court "was free instead to create a federal common-law rule allowing the action to survive." The Court first observed that federal law is "deficient" on the question whether a § 1983 claim survives the death of a party, but that "[s]tate statutes governing the survival of state actions do exist," although they "vary widely with regard to both the types of claims that survive and the parties as to whom survivorship is allowed." 436 U.S. at 588–89, 98 S.Ct. at 1994. Given this gap in the federal law, the Court found that "[u]nder § 1988, this state statutory law . . . provides the principal reference point in determining survival of civil rights actions, subject to the important proviso that state law may not be applied when it is 'inconsistent with the Constitution and laws of the United States.'" 436 U.S. at 589–90, 98 S.Ct. at 1995 (quoting § 1988(a)) (footnote omitted).

The Supreme Court then considered whether Louisiana's survivorship statute was "inconsistent" with federal law, where the application of this state law would result in the abatement of the action before the Court.[17] While recognizing the "broad

---

**16.** In contrast, and as alluded to in *Schleier,* following the enactment of the Civil Rights Act of 1991, traditional compensatory damages are now recoverable under Title VII. *See* 42 U.S.C. § 1981a(a)(1); *see also Russell v. Microdyne Corp.,* 65 F.3d 1229, 1241 (4th Cir.1995) ("[U]nlike the ADEA, Title VII now permits the recovery of both compensatory and punitive damages."). In light of this distinction, one of the decisions cited by Plaintiffs, in which the Sixth Circuit affirmed an award of emotional distress damages to a

"particularly vulnerable" plaintiff following her discharge in violation of Title VII, does not control here. *See Turic v. Holland Hospitality, Inc.,* 85 F.3d 1211, 1215 (6th Cir.1996).

**17.** Specifically, the Louisiana survivorship statute permitted the survival of actions only in favor of a spouse, children, parents or siblings, and no person with the requisite relationship to the plaintiff was alive at the time of his death. *See* 436 U.S. at 587, 98 S.Ct. at 1993.

sweep of § 1983," the Court nevertheless found "nothing in the [federal] statute or its underlying policies to indicate that a state law causing abatement of a particular action should invariably be ignored in favor of a rule of absolute survivorship." 436 U.S. at 590, 98 S.Ct. at 1995. The Court further explained:

It is true that § 1983 provides "a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation." That a federal remedy should be available, however, does not mean that a § 1983 plaintiff (or his representative) must be allowed to continue an action in disregard of the state law to which § 1998 refers us. A state statute cannot be considered "inconsistent" with federal law merely because the statute causes the plaintiff to lose the litigation. If success of the § 1983 action were the only benchmark, there would be no reason at all to look to state law, for the appropriate rule would then always be the one favoring the plaintiff, and its source would be essentially irrelevant. But § 1988 quite clearly instructs us to refer to state statutes; it does not say that state law is to be accepted or rejected based solely on which side is advantaged thereby.

436 U.S. at 593, 98 S.Ct. at 1996–97 (citation omitted). Because disadvantage to the plaintiff was the sole "inconsistency" identified by the courts below, the Su-

preme Court concluded that the Louisiana survivorship statute should be applied.[18]

Two distinctions may be drawn between *Robertson* and this case. On one hand, *Robertson* expressly does not reach a case where, as claimed here, the defendant's violation of federal law allegedly contributed to the plaintiff's death. *Cf. Carlson v. Green*, 446 U.S. 14, 23–24, 100 S.Ct. 1468, 1478, 64 L.Ed.2d 15 (1980) (distinguishing *Robertson* on this basis, among others, in holding that federal and not state law governs the survival of *Bivens* actions brought against federal officials).[19] On the other hand, the ADEA lacks any provision analogous to § 1988, which expressly invites the courts to look to state law where federal law is "deficient."

This latter distinction presumably accounts for the uniform consensus among the courts that federal common law governs the survival of ADEA claims. *See, e.g., Smith v. Department of Human Servs.*, 876 F.2d 832, 834 (10th Cir.1989); *Estwick v. U.S. Air Shuttle*, 950 F.Supp. 493, 498 (E.D.N.Y.1996); *Hawes v. Johnson & Johnson*, 940 F.Supp. 697, 702 (D.N.J.1996), *aff'd*, 202 F.3d 254 (3d Cir. 1999); *see also Khan v. Grotnes Metalforming Sys., Inc.*, 679 F.Supp. 751, 756 (N.D.Ill.1988) (expressly contrasting the ADEA from § 1983, with its incorporation of state law through § 1988). Neither this Court nor the parties have identified any instance in which a court resorted to the law of the forum state to determine whether a federal claim under the ADEA survived the death of the plaintiff. Rather, in

**18.** The Court cautioned that its ruling was "a narrow one," subject to two qualifications. First, the Court emphasized that its holding was "limited to situations in which no claim is made that state law generally is inhospitable to survival of § 1983 actions" under all circumstances. 436 U.S. at 594, 98 S.Ct. at 1997. Next, upon noting that the plaintiff's death in the present case "was not caused by the deprivation of rights for which he sued under § 1983," the Court declined to consider "whether abatement based on state law could be allowed in a situation in which deprivation of federal rights caused death." 436 U.S. at 594, 98 S.Ct. at 1997.

**19.** In *Jefferson v. City of Tarrant*, 520 U.S. 1154, 117 S.Ct. 1333, 137 L.Ed.2d 493 (1997), the Supreme Court granted certiorari in a § 1983 suit where the decedent's death allegedly "resulted from a deprivation of federal civil rights" by Alabama officials. In that case, the Court intended to consider whether Alabama's wrongful death act determined the types of damages recoverable under the § 1983 claim brought by the representative of the decedent's estate. Subsequently, however, the Court dismissed the writ of certiorari as improvidently granted, finding that the state-court decision on appeal was not a final judgment. *See* 522 U.S. 75, 118 S.Ct. 481, 139 L.Ed.2d 433 (1997).

each and every case, the courts have relied solely on federal common law, where the rule is that "actions which are penal in nature do not survive the death of a party." *Estwick*, 950 F.Supp. at 498.

To determine whether an action under the ADEA is penal or remedial in nature, the courts have applied a three-factor test adopted by the Sixth Circuit in *Murphy v. Household Finance Corp.*, 560 F.2d 206, 209 (6th Cir.1977): (i) whether the purpose of the action is to address individual wrongs or general wrongs to the public; (ii) whether the recovery runs to the individual or the public; and (iii) whether the recovery is disproportionate to the harm suffered. *See Smith*, 876 F.2d at 835 (applying these three *Murphy* factors); *Estwick*, 950 F.Supp. at 498 (same). Upon performing this inquiry in the context of the ADEA, the courts have held that ADEA claims survive the plaintiff's death only to the extent that the plaintiff does not seek "punitive" damages. *See Smith*, 876 F.2d at 835–37; *Estwick*, 950 F.Supp. at 498; *Hawes*, 940 F.Supp. at 702–03.[20]

Although Plaintiff Kulling concedes that federal common law, and not Michigan's survival statute, determines whether her ADEA claim survives her husband's death, she nonetheless invites the Court to look to Michigan's wrongful death act when determining the relief available to her under this claim. This argument, however, faces a number of obstacles which the Court finds insurmountable, at least in the aggregate. First, neither Plaintiff nor this Court has uncovered a single decision that looks beyond the four corners of the ADEA to determine the relief recoverable for a violation of this federal statute. To the contrary, it is at least implicit in the above-cited decisions addressing the survival of ADEA claims that the ADEA itself determines the sorts of relief available for violations of federal age discrimination law, and that this remains true after the death

of a party. Were it otherwise, the survival of a federal ADEA claim would turn upon the types of damages available—*i.e.*, remedial versus punitive—under a given state's wrongful death act. Yet, the courts that have considered the survival of ADEA claims have confined their inquiries to the remedies provided by the federal statute itself, and not by any state's wrongful death act. *See, e.g., Smith*, 876 F.2d at 835–37.

Next, even if the ADEA contained a provision similar to § 1988 which authorized resort to state law under certain circumstances, it is doubtful whether the Court could stray beyond the four corners of the ADEA on the issue of relief. Even under § 1988, federal law must first be deemed "deficient" in some way before a court may turn to other sources. As discussed earlier, however, the ADEA is by no means "deficient" in its remedial provisions; it merely limits recovery to back pay, reinstatement or front pay, and liquidated damages, while precluding awards of traditional tort-based compensatory damages. The Court declines to view the ADEA as "silent" on other forms of relief, thereby permitting resort to other sources of law, particularly where, as noted earlier, Congress specifically amended Title VII to permit the recovery of compensatory damages, while notably making no such change to the ADEA.

Moreover, the Supreme Court's § 1983 jurisprudence suggests that the relief available under a federal statute is uniquely a matter of federal law, even where § 1988 invites the courts to look to the law of the forum state. The Court has repeatedly observed that neither § 1983 nor its legislative history provides specific guidance as to the sorts of damages recoverable for a violation of federally secured rights. *See, e.g., Smith v. Wade*, 461 U.S. 30, 34, 103 S.Ct. 1625, 1628, 75 L.Ed.2d 632 (1983); *Carey v. Piphus*, 435 U.S. 247,

---

**20.** Technically, ADEA does not authorize the recovery of "punitive" damages, but only "liquidated damages" in cases involving "willful violations." *See* 29 U.S.C. § 626(b). The Supreme Court has held, however, that the "liq- uidated damages" authorized under ADEA are in fact "punitive in nature." *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 125, 105 S.Ct. 613, 624, 83 L.Ed.2d 523 (1985).

255–58, 98 S.Ct. 1042, 1048–49, 55 L.Ed.2d 252 (1978). Nevertheless, when the Court considered, for example, whether punitive damages are available under § 1983, it did not look to a particular state's law as authorized under § 1988, but instead looked to the whole of the common law of torts to fashion a uniform federal standard. *See Smith,* 461 U.S. at 34–48, 103 S.Ct. at 1628–36; *see also Carey,* 435 U.S. at 254–59, 98 S.Ct. at 1047–50 (also surveying common-law tort rules to determine the damages recoverable for a denial of procedural due process).

Upon reviewing these and other Supreme Court decisions in a § 1983 suit involving a murder of an inmate, Mark Berry, by his fellow prisoners, the Tenth Circuit declined to determine the scope and extent of the available relief by reference to the wrongful death statute of the forum state, Oklahoma. *See Berry v. City of Muskogee,* 900 F.2d 1489, 1501–07 (10th Cir.1990). In that case, the Tenth Circuit found itself confronted with an issue similar to the one confronting this Court:

> The difficult question we face here is whether damages in a § 1983 action in which death occurs are limited to those recoverable under the Oklahoma survival action alone, or to those recoverable by such a survival action and an Oklahoma wrongful death suit, or whether damages are determined by some federal standard either as a survival or wrongful death-type action not defined or limited by state law.

900 F.2d at 1501.[21] The Court acknowledged that § 1988 permits the borrowing of state law where federal law is "deficient," but concluded that inconsistencies in the laws of the various states would disserve the purposes of § 1983:

> In the case before us the recovery permitted under the Oklahoma wrongful death act duplicates, in many respects, the recovery Mark Berry might have

obtained had he lived to sue for his injuries. But, as we have noted, the act permits recovery of the loss of consortium and grief of the surviving spouse, children, and parents, which Mark Berry could not have recovered had he lived. In considering whether the purposes of § 1983 are satisfied by adoption of state survival and wrongful death actions, we must consider that different states will define them differently, thus requiring individual analyses of each state's law. We might have to find that a state's law works satisfactorily in some instances, as when there are surviving dependents, but not in other cases, as when there is no one with a right to sue.

> Weighing these concerns, and considering the Supreme Court's approach in *Smith* [and other cases], we conclude that supplementing a state survival action with a state wrongful death action does not satisfy the criteria of § 1988 for borrowing state law. The laws are not suitable to carry out the full effects intended for § 1983 cases ending in death of the victim; they are deficient in some respects to punish the offenses. Application of state law, at least in some instances, will be inconsistent with the predominance of the federal interest.

> We therefore conclude, as did the Sixth Circuit in [*Jaco v. Bloechle,* 739 F.2d 239 (6th Cir.1984) ], that the federal courts must fashion a federal remedy to be applied to § 1983 death cases. The remedy should be a survival action, brought by the estate of the deceased victim, in accord with § 1983's express statement that the liability is "to the party injured." It must make available to plaintiffs sufficient damages to serve the deterrent function central to the purpose of § 1983.

900 F.2d at 1506–07 (citations omitted).[22]

Given the rulings of the Supreme Court and the appellate courts in the context of

---

**21.** As noted earlier, the Supreme Court recently granted certiorari to address this same question, but then dismissed the writ as im-

providently granted. *See Jefferson, supra,* 522 U.S. 75, 118 S.Ct. 481, 139 L.Ed.2d 433.

**22.** As alluded to in this passage, the Tenth

§ 1983, it is difficult to see how this Court could appropriately borrow from Michigan law in fashioning a remedy under the ADEA. As discussed, § 1983 provides little guidance as to remedies, and it also, through § 1988, expressly authorizes resort to state law where necessary to fill gaps in the federal statutory scheme. In contrast, the ADEA includes specific remedial provisions, and it lacks any suggestion that courts may look to other sources of law to fashion additional remedies. Under these circumstances, this Court finds little legal authority for the proposition that Michigan law provides an appropriate point of reference in determining the relief awardable under the ADEA.

Moreover, to incorporate a § 1988 analysis into the ADEA, by looking in each case to the law of the forum state, would pose precisely the risk that the Tenth Circuit found unacceptable in *Berry:* namely, that each state's law would permit a different recovery under the same or similar facts, thereby undermining the uniformity of federal age discrimination law. While Michigan law might produce a more desirable result for the plaintiff here, such cases as *Robertson, Berry,* and *Jaco* reveal that state survival and wrongful death statutes do not always favor plaintiffs. And, as explained in *Robertson,* there is no principled basis for adopting state law only when it favors the plaintiff or supplements the remedies otherwise available under the ADEA. Accordingly, the Court declines to borrow from Michigan's wrongful death statute in determining the relief recoverable by Plaintiff Kulling under the ADEA. Rather, the Court concludes that the scope and extent of this relief must be determined solely by resort to the ADEA itself.

Nevertheless, Plaintiff Kulling suggests that the Court can remain within the four corners of the ADEA, while still awarding the wrongful death damages she seeks. In particular, Mrs. Kulling points to the ADEA's language authorizing the courts to "grant such legal or equitable relief as may be appropriate to effectuate the purposes of this chapter." 29 U.S.C. § 626(b). This clause, however, is not nearly so open-ended as it might first appear, when viewed in the context of the language that follows and qualifies it. As the Seventh Circuit explained, in a case in which the plaintiff, Merwin Moskowitz, sought to recover consequential damages beyond back pay and benefits:

The age discrimination law authorizes the courts to grant "such legal or equitable relief as may be appropriate to effectuate the purposes" of the law. 29 U.S.C. § 626(b). Moskowitz is not seeking equitable relief, such as reinstatement, or "front pay" in lieu of reinstatement when reinstatement is infeasible. He is seeking damages, the standard "legal" (as distinct from equitable) remedy. He claims that the defendants caused him to lose income from other sources. The statutory language that we just quoted is broad enough to encompass a claim for such damages—but only when the language is taken out of its context. For immediately after it the statute says that "legal and equitable relief ... includ[es] without limitation judgments compelling employment, reinstatement or promotion, or enforcing the liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation under this section." The

Circuit reached the same result as had the Sixth Circuit in *Jaco,* 739 F.2d at 241–43, albeit for somewhat different reasons. In *Jaco,* the Court declined to permit the recovery of damages under Ohio's wrongful death statute in a § 1983 claim brought by the mother of the decedent, who was shot and killed by police officers outside his home. In so ruling, the Sixth Circuit reasoned that wrongful death damages accrue to the benefit of the decedent's heirs, while § 1983 is in-

tended only to compensate for the personal injuries suffered by the party whose civil rights have been violated. Thus, the Court concluded that the decedent's mother lacked standing under § 1983 to recover damages on behalf of herself and her son's other heirs, but that she could recover only on behalf of her son's estate for personal injuries suffered by the decedent himself. *Jaco* will be discussed further below.

mysterious expression—mysterious in a statute concerned with age discrimination rather than with subminimum wages or excessive hours—"amounts deemed to be unpaid minimum wages or unpaid overtime compensation" reflects the fact that the age discrimination law incorporates the remedies of the Fair Labor Standards Act. Specifically, "amounts owing to a person as a result of a violation of [the age discrimination law] shall be deemed to be unpaid minimum wages or unpaid overtime compensation for purposes of" the remedial provisions of the FLSA. 29 U.S.C. § 626(b). The only "legal" relief specified in the "includ[es] without limitation" provision of section 626(b) is an award of "amounts owing to a person as a result of a violation," and the natural way to take this language is as referring to amounts such as wages or benefits that the employer should have given the employee but did not because of the latter's age. That would exclude the consequential damages sought here. Purdue [University, the plaintiff's former employer] does not "owe" Moskowitz any amount of post-retirement income. The claim is rather that Purdue has interfered with his receipt of such income from other sources.

Well, but what about "without limitation"? Although Moskowitz is not asking for the statutorily specified legal relief, the statute seems not to be limited to that form of legal relief. But we think it is. If Congress wanted to grant age discrimination plaintiffs full rights to common law damages, why did it use as its remedial template the Fair Labor Standards Act? The phrase "without limitation" invites courts to be imaginative in the devising of equitable remedies; the invention of front pay is an example. It does not invite the courts to undo the limitations that the Fair Labor Standards Act places on nonequitable relief. If we were to break out of the FLSA framework, as invited by Moskowitz to do, we could not reasonably stop with post-retirement income.

Like other forms of tortious conduct, age discrimination can cause psychological distress but the cases hold ... that the courts are not authorized to grant such "legal relief" to age discrimination plaintiffs. These cases show that "without limitation" is not to be taken literally when the issue is whether to award legal relief that is novel by the standards of the Fair Labor Standards Act. We do not see how these cases can be distinguished from our case.

*Moskowitz, supra,* 5 F.3d at 283 (citations omitted).

This reasoning applies with full force here, where Plaintiff Kulling seeks legal relief beyond back pay and lost benefits, such as compensation for her husband's pain and suffering, for loss of financial support, and for loss of consortium. To be sure, as suggested earlier in the Court's discussion of *Robertson,* an argument can be made for a greater recovery here than in other cases, where Plaintiff alleges that Defendants' violation of the ADEA was a contributing factor in Mr. Kulling's death. Under these circumstances, wrongful death damages seemingly are "appropriate to effectuate the purposes" of the ADEA, 29 U.S.C. § 626(b), as such relief would better ensure that Defendants bear the full cost of the harms they allegedly inflicted.

Yet, the additional relief sought by Mrs. Kulling is altogether different in kind, and not merely in degree, from that typically awardable under the ADEA. In *Schleier, supra,* 515 U.S. at 336, 115 S.Ct. at 2167, the Supreme Court explained that the ADEA, unlike Title VII in its present form, does not provide for tort-based awards of compensatory damages. Rather, the only forms of monetary relief recoverable under the statute are back pay and lost benefits, which are restitutionary in nature, and liquidated damages, which are punitive in nature. This Court is unwilling to override the legislative judgment, as embodied in the ADEA's incorporation of the FLSA's remedial scheme,

that violations of federal age discrimination law do not give rise to awards of compensatory damages. While Congress has determined that such relief is now warranted under Title VII for other forms of discrimination in employment, it has not seen fit to extend this compensatory scheme to the ADEA. Neither, then, may this Court do so, even though this result arguably might "effectuate the purposes" of the ADEA.

To summarize, having reviewed the limited case law on point, and having extensively surveyed the analogous precedents arising under other federal statutes such as 42 U.S.C. § 1983, the Court has reached the following conclusions. First, as a matter of federal common law, Carl Kulling's claim under the ADEA survives his death, except to the extent that it seeks an award of "liquidated damages" as defined by the statute. Thus, Plaintiff Laverne Kulling may pursue this ADEA claim as the personal representative of Mr. Kulling's estate. Next, the relief recoverable by Mrs. Kulling under the ADEA is limited to that permitted under the remedial provisions of the federal statute itself, and may not be expanded by resort to Michigan's wrongful death statute or through the creation of a federal common law of wrongful death damages. Accordingly, Plaintiff's federal ADEA claim provides no basis for awarding the compensatory, pain and suffering, or loss of consortium damages to which Mrs. Kulling otherwise might be entitled under the Michigan wrongful death statute.

### D. Plaintiff's State–Law Claim for Wrongful Death Damages

The foregoing analysis, however, is not quite the end of the matter. As Plaintiffs point out in their supplemental brief, there is a distinction between the relief sought by Mrs. Kulling on behalf of her late husband on account of harms he suffered up

until his death, and the relief sought by Mrs. Kulling on behalf of her husband's beneficiaries to compensate for harms they have suffered through the loss of Mr. Kulling. Thus, while the ADEA might "occupy the field" as to the former sort of relief, at least where Plaintiffs have not asserted parallel state-law claims of age discrimination, it does not necessarily follow that the ADEA preempts or displaces awards of the latter form of relief under a state statute. Stated differently, the same alleged wrong—namely, a violation of federal age discrimination law—might trigger recoveries under both the ADEA and a state statute. Although Plaintiffs decline to characterize this latter sort of claim as state or federal in nature, they maintain that this theory of recovery stands apart from the ADEA, and thus is not subject to the remedial limitations found in that statute.[23]

■ The Court agrees. Initially, Plaintiffs correctly assert that the ADEA does not wholly preempt any and all state-law causes of action that might arise from an act of age discrimination. For example, a plaintiff may assert both federal- and state-law claims of age discrimination arising from a single instance of allegedly unlawful conduct. *See Moody v. Pepsi–Cola Metro. Bottling Co.*, 915 F.2d 201, 209–10 (6th Cir.1990). Indeed, in *Moody,* a case involving age discrimination claims brought under both the ADEA and Michigan's Elliott–Larsen Civil Rights Act, the Sixth Circuit affirmed an award of emotional distress damages under the state-law claim, even though, as explained above, these damages were unavailable under the ADEA. 915 F.2d at 209–11. In addition, it is not unusual that a violation of a federal law or regulation will trigger a state-law cause of action, with the recovery determined under state law. *See, e.g., Merrell Dow Pharmaceuticals, Inc. v. Thompson,*

---

**23.** The Court notes that the "separateness" of this theory of recovery is not evident from the face of the Complaint. Mrs. Kulling did not plead a separate cause of action under Michigan's wrongful death statute, but instead cited it as a basis for recovering additional damages based on Defendants' alleged ADEA violation. (*See* First Amended Complaint at ¶ 25.)

478 U.S. 804, 106 S.Ct. 3229, 92 L.Ed.2d 650 (1986).

More specifically, in *Jaco, supra,* the Sixth Circuit recognized precisely the distinction Plaintiffs have drawn here between a federal claim brought on behalf of a decedent to vindicate his federally protected rights and a wrongful death claim brought to redress injuries suffered by the heirs of the decedent. In particular, in that case, the Court carefully distinguished between federal civil rights claim brought by a mother on behalf of her son, who was shot and killed by police officers, and a wrongful death claim brought on behalf of the decedent's heirs. The Court observed that the former claim was governed by § 1983, with its incorporation of a state survival statute through § 1988, while the latter claim arose solely under the state's wrongful death statute:

> It is perhaps appropriate at this juncture to distinguish between survival actions and wrongful death actions. It is conceded by most courts that they are distinct causes of action. A survival claim is predicated upon the decedent's claim for damages sustained during his lifetime. On the other hand, a wrongful death action creates a new and separate claim or cause of action for the damages sustained by the decedent's estate as a result of his death. The distinction as it arises in conjunction with alleged § 1983 violations is apparent. The § 1983 cause of action, by virtue of the explicit language of the section itself, is a personal action cognizable only by the party whose civil rights had been violated; while, on the other hand, the wrongful death action is a cause of action that inures to the benefit of decedent's estate, as a result of, not the personal injury suffered by the *decedent,* but rather, injuries to his estate cause by his wrongful death.... Patently, Ohio's wrongful death statute creates a cause of action in tort in favor of the decedent's heirs for damages resulted from losses of prospective advantages which have been pretermitted by the wrongful death of the victim. Certainly, in a

sense, the heirs are injured parties as a result of decedent's premature demise[;] however, to arbitrarily conclude that their injuries resulted from an infringement of their civil rights would be sheer obfuscation of the issue. Simply stated, the wrongful death of the decedent resulting from a tort, which gives rise to the cause of action for the benefit of his heirs, is not equivalent to decedent's personal § 1983 claim....

*Jaco,* 739 F.2d at 242–43 (citation omitted); *see also Berry, supra,* 900 F.2d at 1506–07 (distinguishing between a federal "survival action" under § 1983 for injuries suffered by the decedent and a state wrongful death action brought on behalf of his heirs).

As is clear from the Court's discussion in *Jaco,* such a wrongful death action brought for the benefit of the decedent's heirs is a *state-law* cause of action, even though it might be triggered by a violation of federally protected rights. Indeed, the Sixth Circuit expressly so held, stating that "the claim of Jaco's heirs under the wrongful death enactment is a cause of action separate from the civil rights claim and should have been treated as a *state* claim subject to the trial court's pendent jurisdiction." *Jaco,* 739 F.2d at 243 n. 5. Similarly, in *Berry,* the Tenth Circuit explained that the wrongful death claims asserted on behalf of the decedent's heirs in that case were "pendent state claims." *Berry,* 900 F.2d at 1507. Thus, while Plaintiff Kulling here is reluctant to characterize her wrongful death claim as such (presumably, for reasons discussed below), this Court readily concludes that it is a state-law claim.

■ Because this is so, Mrs. Kulling's wrongful death claim is barred by the "Severance Agreement and General Release" executed by Mr. Kulling on November 10, 1997, three days after his discharge. This agreement provided that Mr. Kulling would be given severance pay of $17,138.70 and certain other benefits, and further stated:

In consideration of the aforementioned payments and other consideration given by Company to Employee, Employee, on behalf of Employee, Employee's heirs, personal and legal representatives, successors and assigns, hereby irrevocably and unconditionally releases, quits[,] forever discharges and covenants not to sue Company ... from any and all complaints, claims, charges, liabilities, damages, obligations, promises, agreements, grievances, suits, costs, debts, attorney's fees, and other legal expenses and causes of action of any nature whatsoever, whether known or unknown at this time, based upon contract, tort or otherwise, under the laws of the United States, including but not limited to any claims relating to the [ADEA] ... or any other claims under any federal, state or local statu[t]e, regulation, rule, ordinance, collective bargaining agreement, common law or other law arising out of or relating to Employee's employment by and termination of his employment from Company which Employee has, had or may have ... arising from or relating to occurrences or non-occurrences through the effective date of this Agreement ... or involving the continuing effects of any acts or omissions which occurred prior to the date of this agreement.

(Defendants' Motion, Ex. 5, Kulling Severance Agreement at 2–3.)

On its face, this provision operates to release Mrs. Kulling's wrongful death action against Defendants. In exchange for severance pay and other benefits, Mr. Kulling promised, not only on his own behalf but on behalf of his "heirs, personal and legal representatives, successors and assigns," not to bring suit against Defendants under state or federal law "arising out of or relating to" the termination of his employment. The Sixth Circuit has held that, under Michigan law, such a settlement agreement between the plaintiff's decedent and the defendant precludes the plaintiff, as personal representative, from pursuing a state-law cause of action for wrongful death. *See Kane v. Rohrbacher*, 83 F.3d 804, 805–06 (6th Cir.1996). The Court reasoned that a suit brought under the Michigan wrongful death statute is "derivative ... of a decedent's underlying tort action" and, therefore, a personal representative is barred from bringing suit to the same extent that the decedent would have been barred if he had survived. 83 F.3d at 805–06. In the present case, then, Mrs. Kulling is bound by the release executed by her husband on behalf of himself and his heirs and personal representatives.

Plaintiff Kulling, however, challenges both the legal and factual bases for this result. First, noting the "derivative" nature of her wrongful death claim, Mrs. Kulling argues that Defendants' purported failure to satisfy the terms of the OWBPA, 29 U.S.C. § 626(f), invalidates Mr. Kulling's release, not just of his ADEA claim, but also of any claims which are "derivative" of this claim. Yet, as Plaintiffs recognize elsewhere in their own supplemental brief, an action under Michigan's wrongful death act is "derivative" only in the narrow sense that "the personal representative of the deceased stands in his shoes and is required to show that the deceased could have maintained the action if death had not ensued." *Maiuri v. Sinacola Constr. Co.*, 382 Mich. 391, 170 N.W.2d 27, 30 (1969). In all other respects, the Michigan statute creates a "new action," brought to redress the injuries suffered by the beneficiaries named in the statute. *See Endykiewicz v. State Highway Comm'n*, 414 Mich. 377, 324 N.W.2d 755, 760 (1982); *Maiuri*, 170 N.W.2d at 29. Indeed, were this not so, Mrs. Kulling could not pursue a claim for wrongful death damages under the Michigan statute, since, as held earlier, such damages are not recoverable where only ADEA claims are asserted.

In essence, Plaintiff seeks to have it both ways, arguing that the Michigan act confers separate, substantive rights upon the heirs of Mr. Kulling that are not displaced by the ADEA's remedial scheme, yet also arguing that this separate wrong-

ful death claim is sufficiently "derivative" of Mr. Kulling's ADEA claim that the protections of the OWBPA extend to the heirs' claims as well. The Court accepts the former contention, but not the latter. Rather, as set forth above, Plaintiff's wrongful death claim is a *state-law* claim, and serves to vindicate rights apart from—albeit, in a limited sense, derivative of—those granted to Mr. Kulling under the ADEA. The OWBPA, under the express language of the statute itself, encompasses only "right[s] or claim[s] under" the ADEA. 29 U.S.C. § 626(f)(1); *see also Seus v. John Nuveen & Co.,* 146 F.3d 175, 181 (3d Cir.1998) (holding that the protection afforded by the OWBPA "is limited to the waiver of substantive rights under the ADEA"), *cert. denied,* 525 U.S. 1139, 119 S.Ct. 1028, 143 L.Ed.2d 38 (1999). This federal statute does not extend to waivers of state-law rights or claims, *see Branker v. Pfizer, Inc.,* 981 F.Supp. 862, 867 (S.D.N.Y.1997), even if these rights or claims are in some sense "derivative" of rights conferred under the ADEA.[24]

Finally, Plaintiff argues that the release signed by Mr. Kulling is ineffective to waive a wrongful death claim, as this claim did not yet exist when the release was executed. This contention, however, cannot be squared with the ruling in *Kane, supra,* where the Sixth Circuit held that a release signed by the decedent before his death operated to bar a subsequent wrongful death suit brought by his personal rep-resentative. Nor, contrary to Plaintiff's contention, can it be said that Mr. Kulling was wholly unaware of a possible violation of his rights when he signed the severance agreement. In fact, Defendants had already committed their alleged wrongdoing when they terminated Mr. Kulling; only the extent of his injuries remained unknown. Indeed, before Mr. Kulling signed the severance agreement, Mrs. Kulling, according to her own testimony, had already met with Defendant's vice president and general manager, Gary Blanchard, who allegedly told her that "the company was downsizing, and they were letting go of the older, more senior people." (Plaintiffs' Response, Ex. A, Kulling Dep. at 108.)

Thus, the release signed by Mr. Kulling is not invalid for waiving prospective claims. Neither has Plaintiff identified any other respect in which the release was not knowingly or voluntarily given. Consequently, the Court concludes that, by virtue of the "Severance Agreement and General Release" signed by her late husband, Plaintiff Kulling is precluded from recovering damages under Michigan's wrongful death statute. Instead, Mrs. Kulling's recovery in this case is limited to the relief her husband could have obtained under the ADEA if not for his death, minus any "punitive" recovery of liquidated damages Mr. Kulling might have achieved in the event that Defendants are determined to be "willful" violators of the federal statute.[25]

---

24. Under this same reasoning, Mrs. Kulling's state-law loss-of-consortium claim asserted in Count II of the amended complaint was released under the severance agreement signed by her husband, and is not saved by any alleged violation of the OWBPA. Again, Plaintiffs recognize that a loss-of-consortium claim is "derivative" only in the limited sense discussed earlier, and that, in all other respects, "loss of consortium is a separate cause of action." *Eide v. Kelsey–Hayes Co.,* 431 Mich. 26, 427 N.W.2d 488, 489 (1988).

25. Given the Court's ruling on the issue of wrongful death damages, a number of pending motions are now moot. First, Defendants' June 28, 2000 motion to compel a psychiatric examination of Plaintiff Laverne Kulling and Plaintiffs' July 24, 2000 motion to quash the deposition of Dr. Sander J. Breiner are now moot, because the discovery requests that are the subject of these motions related to Plaintiff Kulling's claim for emotional distress damages and the cause of Mr. Kulling's suicide, neither of which has any remaining relevance to the outstanding ADEA claims. Similarly, Defendants' May 19, 2000 motion for severance and/or bifurcation and their June 16, 2000 motion for leave to file notice of non-party fault are also moot, because both of these motions rest upon the premise that the events surrounding Mr. Kulling's suicide might play a role at trial. For the reasons discussed above, the circumstances surrounding Mr. Kulling's death will have no effect on the relief recoverable by Mrs. Kulling.

## IV. *CONCLUSION*

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendants' May 19, 2000 Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART. Consistent with this Opinion and Order, Defendants' motion is granted to the extent that it seeks the dismissal of Plaintiff Laverne Kulling's separate claim for loss of consortium, and to the extent that it seeks to exclude any recovery by Plaintiff Kulling under Michigan's wrongful death statute, but is in all other respects denied.

IT IS FURTHER ORDERED that the following motions are DENIED AS MOOT: (1) Defendants' May 19, 2000 Motion for Severance and/or for Bifurcation; (2) Defendants' June 16, 2000 Motion for Leave to File Notice of Non–Party Fault; (3) Defendants' June 28, 2000 Motion for Psychiatric Examination of Plaintiff Laverne Kulling; (4) Plaintiffs' July 7, 2000 Motion to Strike Portions of Defendants' Reply Brief; and (5) Plaintiffs' July 24, 2000 Motion to Quash Deposition of Dr. Sander J. Breiner.[26]

---

**26.** Regarding this last motion, the Court sees no need for Defendants to take Dr. Breiner's deposition, and therefore presumes that this deposition will not go forward.